TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-04-00811-CV






Eric H. Scheffey, Appellant


v.


Mike Geeslin, Commissioner of Insurance of the Texas Department of Insurance (1) and
Texas Medical Liability Insurance Underwriting Association, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT

NO. 93-13647, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Eric Scheffey is an orthopedic surgeon who obtained professional liability insurance
from the Texas Medical Liability Insurance Underwriting Association ("JUA"). After the JUA
settled several claims that had been filed against Scheffey, it informed him that in order to renew his
policy, he would have to pay a surcharge. Scheffey appealed the JUA's decision, and the
Commissioner of the Texas Department of Insurance ("Commissioner") issued an order stating that
the surcharge was proper. Scheffey appealed the Commissioner's order, and the district court
affirmed the order. Scheffey appeals the judgment of the district court, contending that the JUA did
not have the authority to impose the surcharge or, alternatively, that the surcharge did not comply
with the relevant statutory requirements. In addition, Scheffey argues that the Commissioner's order
was not supported by substantial evidence. We will affirm the judgment of the district court. (2)

 

BACKGROUND

 The JUA is a joint underwriting association created by statute (the "JUA Act") to
provide insurance for health-care providers who are unable to obtain coverage in the voluntary
market. See Act of May 29, 1975, 64th Leg., R.S., ch. 331, § 1, 1975 Tex. Gen. Laws 867, 867,
amended by Act of March 30, 1977, 65th Leg., R.S., ch. 59, §§ 1-3, 1977 Tex. Gen. Laws 129, 129,
amended by Act of May 30, 1977, 65th Leg., R.S., ch. 817, §§ 31.03-.12, 1977 Tex. Gen. Laws 2039,
2057, amended by Act of May 30, 1981, 67th Leg., R.S., ch. 829, § 1, 1981 Tex. Gen. Laws 3159,
3159 (creating JUA) ("Former Tex. Ins. Code art. 21.49-3"), repealed by Act of May 24, 2005,
79th Leg., R.S., ch. 727, § 18, 2005 Tex. Gen. Laws 1752, 2186 (current version at Tex. Ins. Code
Ann. §§ 2203.001-.406 (West Supp. 2007)). The JUA consists of all insurers authorized to write
liability insurance in Texas and is designed to be a self-supporting association. Id. § 3(a). The JUA
has the power to issue insurance policies on behalf of the insurance companies that are its members. 
Id. § 3(b). 

 At the time relevant to this appeal, Eric Scheffey had coverage through the JUA for
his work as an orthopedic surgeon. Although the amount of his coverage varied over the years,
Scheffey had continuous coverage through the JUA from 1985 to 1993. 

 As the result of services he provided in the 1980s, several claims were filed against
Scheffey. When contemplating the possibility of settling the suits, Scheffey was informed of the
possibility of spreading the settlements over several policy periods in order to prevent exhausting his
coverage in any one year. Although Scheffey acknowledges that he was informed that settling his
claims might lead to a premium increase, he argues that he was not told how the increased premium
would be calculated. 

 The first claim against Scheffey was filed by Pete Dunstan and was settled for
$2,250,000. The settlement was spread over several policy periods and paid out in three installments
of $750,000. The second claim was filed by Ron Hardman and was settled for $1,000. The final
claim was filed by Jose Oseguera and was settled for $925,000. As with the Dunstan case, this
settlement was spread over more than one policy period and paid out in two installments of $462,500. 
 After the claims were settled but before the expiration of Scheffey's 1992 policy, the
JUA sent Scheffey a renewal letter. At that time, Scheffey had a policy providing coverage of
$200,000 per occurrence and $600,000 total annual coverage. The letter stated that to renew his
coverage, Scheffey would have to pay a premium of $63,286. In addition to the premium, the renewal
letter also specified that because of his recent claim settlements, Scheffy would be required to
pay a surcharge. 

 The possibility that a policyholder might have to pay a surcharge was specifically
mentioned in all of the renewal applications Scheffey had signed since obtaining coverage through
the JUA. In particular, the applications contained the following clause: 


The undersigned further recognizes and agrees that such insurance as is applied for
herewith is subject to such rates, premium modifications, surcharges and
policyholder's stabilization reserve fund charges as are now or may hereafter be
approved by the Texas State Board of Insurance. (Emphasis added.) (3) 



 Along with the renewal letter, the JUA also sent Scheffey a copy of the schedule that
the JUA uses when calculating surcharges. Under the terms of the schedule, the JUA imposes a
surcharge on a policyholder when it has had to pay three or more indemnity claims on behalf of a
physician within the past four years. The surcharge is expressed as a percentage of a policyholder's
annual premium. For example, a 100% surcharge would mean that a policyholder would have to pay
the total value of his annual premium as a surcharge. 

 The amount of the surcharge is determined by considering the number and the amount
of all the claims paid on behalf of the policyholder over the previous four years. The schedule lists
five different percentage amounts depending on the value of the claim paid. The total surcharge is
determined by adding the various percentages for each of the claims paid. The schedule provides as
follows:


For Claims Paid Accompanying Percentage


Between $0 to $4,999 0%


Between $5,000 to $24,999 25%


Between $25,000 to $49,999 50%


Between $50,000 to $99,999 100%


Between $100,000 and up 150%



 The schedule also describes an additional charge--a "frequency surcharge"-- that
might be imposed, which is based on the number of claims paid regardless of the value of the claim. 
The relevant language specifies that "after a third claim, regardless of size, has been paid within the
four (4) year period, in addition to any other surcharge(s), an additional surcharge of 25% for each
claim paid over two (2) will be charged for frequency." 

 When calculating Scheffey's surcharge, the JUA treated each settlement payment as
a separate claim. In other words, because some of the settlements paid on behalf of Scheffey had been
divided into separate payments and spread over more than one policy period, the JUA treated each
payment as a separate claim. Under the JUA's analysis, they had paid six claims on behalf of
Scheffey. The JUA also concluded that because, under its analysis, the total number of claims paid
was more than two, a frequency surcharge should be imposed. After performing its calculation, the
JUA determined that Scheffey would have to pay a $537,931 surcharge in order to renew his policy. 
The following chart illustrates how the surchage was calculated:



Plaintiff Amount Paid Amount of Surchage


Dunstan $750,000 150%


Dunstan $750,000 150%


Dunstan $750,000 150%


Hardman $1,000 0%


Oseguera $462,500 150%


Oseguera $462,500 150%


Frequency, over 2 (4 * 25%) 100%


Total Surcharge 850%

 

Renewal Premium ($63,286) * 850% = $537,931 



 Scheffey appealed the imposition of the surcharge to the JUA's board of directors, who
affirmed the decision to impose the additional charge. Scheffey then appealed the JUA's decision
to the Commissioner, who, in light of the fact that the surcharge was being appealed, temporarily
suspended Scheffey's obligation to pay the surcharge as a condition to renewing his policy. 

 After the JUA sent the renewal letter and after the Commissioner suspended the
surcharge, the JUA sought permission from the Deputy Commissioner of Casualty Insurance
("Deputy Commissioner") to impose the surcharge on Scheffey. The JUA formalized this request by
filing an (a) rate application, which is an application that an insurer files when it wants to charge an
individual policyholder a rate that is different than the standard rate typically charged. (4) The JUA
attached a copy of the surcharge schedule to the (a) rate application. After reviewing the application,
the Deputy Commissioner approved the application and the proposed surcharge. 

 Scheffey appealed both the Deputy Commissioner's decision to approve the (a) rate
application and the JUA's decision to impose a surcharge, and a hearing was held before the
Commissioner. See Former Tex. Ins. Code art. 21.49-3, § 7; see also 28 Tex. Admin. Code § 1.705
(2007) ("Any person affected by any action taken by an associate or deputy commissioner under this
subchapter may petition the commissioner for a hearing to review the matter"). After hearing
testimony and reviewing the evidence presented, the Commissioner issued an order affirming the
Deputy Commissioner's approval of the (a) rate application and affirming the decision to
impose a surcharge. 

 Soon thereafter, Scheffey appealed the Commissioner's order to the district court, and
the district court affirmed the order. See Tex. Ins. Code Ann. §§ 36.201 (specifying that
Commissioner's orders are subject to judicial review), .202 (explaining that dissatisfied party may
seek judicial review of Commissioner's action), .203 (providing that judicial review of
Commissioner's action is under substantial evidence rule) (West 2007). Scheffey appeals the
judgment of the district court. See id. § 36.205 (West 2007) (specifying that party may appeal district
court's judgment to appellate court).


STANDARD OF REVIEW

 Many of the issues raised in this case involve statutory construction, which is a
question of law that is reviewed de novo. See Bragg v. Edwards Aquifer Auth., 71 S.W.3d 729, 734
(Tex. 2002); USA Waste Servs. of Houston, Inc. v. Strayhorn, 150 S.W.3d 491, 494
(Tex. App.--Austin 2004, pet. denied). In construing a statute, we must ascertain the legislature's
intent in enacting the statute. Fleming Foods of Tex. v. Rylander, 6 S.W.3d 278, 284 (Tex. 1999). 
In making this determination, courts should look to the plain meaning of the words used in the statute. 
See Fireman's Fund County Mut. Ins. Co. v. Hidi, 13 S.W.3d 767, 768-69 (Tex. 2000). We presume
that every word was deliberately chosen and that excluded words were left out purposely. 
USA Waste Servs., 150 S.W.3d at 494. When determining legislative intent, the entire act, not
isolated portions, must be considered. Jones v. Fowler, 969 S.W.2d 429, 432 (Tex. 1998). We may
also consider the "object sought to be attained" by enacting the statute, the "circumstances under
which the statute was enacted," the "consequences of a particular construction," and the
interpretations of the statute made by an agency. Tex. Gov't Code Ann. § 311.023 (West 2005); see
City of Austin v. Southwestern Bell Tel. Co., 92 S.W.3d 434, 442 (Tex. 2002). Moreover, so long as
the interpretation is reasonable and consistent with the statute, we give weight to an agency's
interpretation of a statute that it is charged with enforcing. Tennessee Gas Pipeline Co. v. Rylander,
80 S.W.3d 200, 203 (Tex. App.--Austin 2002, pet. denied). 

 Some of the issues also concern whether the Commissioner's order is supported by
substantial evidence. See Tex. Gov't Code Ann. § 2001.174 (West 2000) (allowing court to reverse
agency determination if party's substantial rights have been prejudiced because determination is not
supported by substantial evidence). When deciding whether an agency determination is supported
by substantial evidence, we are prohibited from substituting our judgment for the agency's "as to the
weight of the evidence on questions committed to agency discretion." Cities of Abilene, San Angelo,
& Vernon v. Public Util. Comm'n, 146 S.W.3d 742, 748 (Tex. App.--Austin 2004, no pet.) (citing
Tex. Gov't Code Ann. § 2001.174). In making this determination, we are not asked to verify whether
"the agency reached the correct conclusion, but whether some reasonable basis exists in the record
for the agency's action." Id. Further, we presume that an agency's order is supported by substantial
evidence, and the complaining party has the burden of overcoming that presumption. 
See City of El Paso v. Public Util. Comm'n, 883 S.W.2d 179, 185 (Tex. 1994). In fact, the evidence
may actually preponderate against the Commission's finding and be upheld as long as there is enough
evidence to suggest that the Commission's "determination was within the bounds of reasonableness." 
Cities, 146 S.W.3d at 748. 


DISCUSSION

 Scheffey raises five issues on appeal. First, he argues that the JUA did not have the
authority to impose a surcharge. Second, he asserts that even if the JUA had the requisite authority,
the surcharge imposed was improper because it was unreasonably excessive and unfairly
discriminatory. Third, he contends that the surcharge was an unauthorized rate modification because
the surcharge was not properly filed with or approved by the Board of Insurance ("Board"). (5) Fourth,
he asserts that the surcharge was improperly imposed on him without his consent, which he insists
was required by statute. In the same issue, he argues that the JUA's reliance on prior surcharges
imposed on physicians as support for the surcharge at issue in this case was inappropriate because all
of the other physicians consented to the surcharges. Finally, he insists that the Commissioner's order
is not supported by substantial evidence. We will address Scheffey's claims in the order presented.


The JUA's Authority

 In his first issue on appeal, Scheffey argues that the JUA Act does not grant the JUA
the authority to impose surcharges on its policyholders. Scheffey notes that the phrase "surcharge"
is not found in the provisions of the JUA Act and argues that if the legislature had intended to allow
the JUA to impose surcharges on policyholders, it would have also listed that option in the JUA Act. 
Cf. Act of May 27, 1991, 72d Leg., R.S., ch. 242, § 5.02, 1991 Tex. Gen. Laws 939, 999 (authorizing
imposition of premium surcharge when renewing certain property and casualty insurance policies if
insured filed two or more claims in preceding policy year but limits surcharge to no more than ten
percent of total premium), repealed by Act of May 20, 2003, 78th Leg., R.S., ch. 1274, § 26, 2003
Tex. Gen. Laws 3611, 4138. 

 Further, Scheffey notes that the JUA Act does authorize the JUA to impose specific
costs on its policyholders and on its members and argues that, by listing these costs, the legislature
excluded the possibility of imposing additional costs. See Former Tex. Ins. Code art. 21.49-3,
§ 4(b)(3). Specifically, the JUA Act authorizes the JUA to impose a policyholder's stabilization
reserve-fund charge on its policyholders on an annual basis. Id. art. 21.49-3, §§ 4A, 4B. If the JUA
experiences a deficit as the result of its yearly operations, it is authorized to recover for that deficit
from the reserve fund. Id. art. 21.49-3, § 4(b). The JUA Act also authorizes the JUA to impose
additional assessments on all of its policyholders and on all of the companies that are members of
the JUA if there are insufficient funds in the reserve fund to fully cover the JUA's deficits. Id.
art. 21.49-3, §§ 4(b)(3), 5(a), 5(b). 

 Moreover, Scheffey notes that the failure to pay a surcharge is not included in the list
of statutorily authorized justifications for the JUA denying coverage. The list provides that the JUA
may withhold coverage if the policyholder does not meet certain underwriting standards or fails to
pay any applicable "uncontested premium, policyholder stabilization reserve fund charge, or
assessment due from the applicant for prior insurance." See id. § 4(a)(2) (specifying that JUA "shall"
provide coverage for policyholder once it determines that certain prerequisites are satisfied); see also
Tex. Gov't Code Ann. § 311.016 (West 2005) (providing that unless context necessarily requires
different construction, word "shall" will be construed as imposing duty). 

 In addition to noting that the ability to impose a surchage is not listed in the JUA Act,
Scheffey also insists that the power to impose a surcharge cannot be implied from the limited powers
bestowed on the JUA by statute. See Former Tex. Ins. Code art. 21.49-3, § 3(b) (authorizing JUA to
issue insurance policies, underwrite insurance, pay insurance losses, "accept and refuse the
assumption of reinsurance from its members," and "cede and purchase reinsurance"). Moreover,
Scheffey argues that by imposing the surcharge, the JUA is attempting to improperly recover from
Scheffey the value of the claims paid on his behalf. 

 As additional support for his argument that the JUA has no authority to impose a
surcharge, Scheffey notes that several of the documents relevant to the administration of the JUA do
not contain the term "surcharge" or reference the surcharge schedule. First, he points to the JUA's
plan of operation, which the JUA was statutorily required to develop to provide for the administration
of medical liability insurance including the imposition of assessments on policyholders. See Former
Tex. Ins. Code art. 21.49-3, § 3(c); see also 28 Tex. Admin. Code §§ 5.2001-.2006 (2007) (detailing
JUA's plan of operation). Next, Scheffey refers to the JUA's rate manual, which contains the
classifications and rates used by the JUA for underwriting liability insurance, and the JUA's
policy form. 

 For the reasons that follow, we disagree with Scheffey's contention that the JUA has
no authority to impose a surcharge. Although it is true that the portions of the JUA Act detailing the
manner in which the JUA may recover deficits it sustained by providing insurance do not mention
that the JUA may impose a surcharge, that failure would not seem to be determinative of whether the
JUA may alter the rate it charges an individual policyholder to account for the fact that insuring a
particular policyholder carries a significantly increased level of risk to the JUA. In fact, the JUA Act
specifically incorporated other former provisions of the insurance code (subchapter 5(B)) that allowed
for the imposition of a surcharge to account for this type of elevated risk. (6) Specifically, section
4(b)(1) provided, in relevant part, as follows:


The rates, rating plans, rating rules, rating classifications, territories, and policy forms
applicable to the insurance written by the [JUA] and statistics relating thereto shall
be subject to Subchapter B of Chapter 5 of the Insurance Code, as amended. 



Former Tex. Ins. Code art. 21.49-3, § 4(b)(1) (emphasis added).

 One of the provisions of subchapter 5(B) that is relevant to this appeal is former article
5.15-1, which applied "to the making and use of insurance rates by every insurer licensed to write
or engaged in writing professional liability insurance for any physician or health care provider
including rating organizations, acting on behalf of insurers." See Act of May 30, 1977, 65th Leg.,
R.S., ch. 817, § 31.01, 1977 Tex. Gen. Laws 2039, 2054, amended by Act of June 3, 1987, 70th Leg.,
1st C.S., ch. 1, § 2.05, 1987 Tex. Gen. Laws 1, 8, amended by Act of May 24, 1989, 71st Leg., R.S.,
ch. 1027, §§ 15-16, 1989 Tex. Gen. Laws 4128, 4135 ("Former Tex. Ins. Code art. 5.15-1"), repealed
by Act of May 24, 2005, 79th Leg., R.S., ch. 727, § 18(e), 2005 Tex. Gen. Laws 1752, 2186
(repealing most of art. 5.15-1). It authorized insurers to establish group or classification rates but also
authorized insurers to establish individual rates. Specifically, article 5.15-1 provided, in relevant part,
as follows:


For the establishment of rates, risks may be grouped by classifications, by rating
schedules, or by any other reasonable methods. Classification rates may be modified
to produce rates for individual risks in accordance with rating plans which establish
standards for measuring variations in hazards or expense provisions, or both. 



Former Tex. Ins. Code art. 5.15-1, § 3(b) (emphasis added). Moreover, it also stated that no language
in subchapter 5(B) shall be construed as "preventing the filing of different rates for risks in a given
classification or modified rates for individual risks made in accordance with rating plans." Id. § 4(b)
(emphasis added). In addition, former article 5.15-1 specifically allowed insurers to impose
surcharges, as part of an individual rate, "against a health care provider or physician." Id. § 9. (7)

 Moreover, the fact that the JUA's plan of operations, the JUA's rate manual, and the
JUA's policy form do not specifically mention a surcharge would not seem to prohibit the JUA from
imposing a surcharge. The failure to list a power in certain agency documents cannot nullify a power
bestowed on an agency by the legislature. Furthermore, although they do not specifically mention 
a surcharge, both the policy form and the JUA's plan of operation state that premiums will be
calculated in accordance with the JUA Act, which we previously determined incorporated certain
statutory provisions authorizing surcharges. See 28 Tex. Admin. Code § 5.2004(a)(6) (provision of
plan specifying that rates shall be calculated in accordance with requirements of JUA Act). 
Additionally, as discussed previously, the JUA's application form specifically states that the JUA may
impose a surcharge.

 Because the plain language of the JUA Act incorporated various provisions of the
insurance code in effect during the time relevant to this appeal that specifically allowed for the
imposition of surcharges and individualized rates, we conclude that the JUA had the authority to
impose a surcharge on its policyholders and overrule Scheffey's first issue on appeal. 


The Commissioner Properly Found that the Surcharge did Not Violate the Insurance Code 

 In his second issue on appeal, Scheffey argues that even if the JUA Act specifically
incorporated the former provisions of the insurance code allowing for the imposition of a surcharge,
the surcharge imposed by the JUA was still improper because it did not fully comply with all of the
incorporated statutory requirements. See Former Tex. Ins. Code art. 5.15-1, § 3; see also Tex. Gov't
Code Ann. § 2001.174(2)(a) (West 2000) (providing that court may reverse agency's order if its
findings, inferences, conclusions, or decisions are contrary to requirements of statute). Specifically,
Scheffey argues that the surcharge did not comply with the requirements of former article 5.15-1
because it was unreasonable, excessive, and unfairly discriminatory. 

 The Commissioner made explicit findings and one conclusion regarding these
assertions. In finding 44, the Commissioner stated that "[t]here is a reasonable degree of competition
in Harris County and Texas for the classification of orthopedic surgeons' professional medical
liability insurance coverage." In finding 45, the Commissioner stated that the surcharge "does not
unfairly discriminate against Dr. Scheffey, and it is reasonable, considering his past loss experience
and expected future experience. It is neither excessive nor inadequate." In conclusion 10, the
Commissioner echoed these findings by concluding that the surcharge was fair and reasonable and
not excessive, inadequate, or unfairly discriminatory. We review these findings and conclusion to
see if they are supported by substantial evidence and are not contrary to relevant statutory
requirements. See Tex. Gov't Code Ann. § 2001.174(2) (West 2000) (proving that court may reverse
agency's order if its findings, inferences, conclusions, or decisions are contrary to requirements of
statute or not supported by substantial evidence).

 We conclude that the Commissioner properly found that the surcharge did not unfairly
discriminate against Scheffey. The amount of the surcharge was calculated by utilizing the surcharge
schedule, which applied to all physicians and surgeons that had policies through the JUA. Moreover,
under the terms of the schedule, the amount of the surcharge imposed on a policyholder will be the
same as the surcharge imposed on another policyholder in the same class that has the same number
and types of claims filed against him. 

 We also conclude that the Commissioner's determination that the surcharge was
reasonable, and therefore not excessive, is supported by substantial evidence. A rate can be
unreasonable if it is too high or too low for the coverage provided. However, under the former
provisions of the insurance code, the price charged is not the only factor to be considered when
determining whether a rate is unreasonably high. The former provisions of the insurance code also
required proof that "a reasonable degree of competition does not exist in the area with respect to the
classification to which the rate is applicable" before a rate was considered unreasonably high. Former
Tex. Ins. Code art. 5.15-1, § 3(c). (8)
 

 There is substantial evidence to support the determination that a reasonable degree of
competition existed in the geographic region Scheffey was practicing. During the relevant time
period, there were ten insurers providing medical liability insurance in Texas. Further, there were
232 orthopedic surgeons practicing in the same county as Scheffey. Of the 232 orthopedic surgeons,
only three of them had coverage through the JUA. In other words, 229 of the 232 orthopedic surgeons
practicing in the same county as Scheffey were able to obtain coverage in the private sector. (9) 

 Because there was substantial evidence in the record demonstrating that there was a
sufficient degree of competition in the area, it is unnecessary to consider the evidence concerning the
actual amount charged. However, in an abundance of caution and because the evidence is relevant
to other issues, we note that there is substantial evidence demonstrating that the amount of the
surcharge was reasonable for the coverage provided. 

 In particular, the JUA introduced evidence showing that the amount of the surcharge
was based on Scheffey's claim history. See Former Tex. Ins. Code art. 5.15-1, § 9 (mandating that
surcharges imposed on insurance policyholders may be based only "on claims actually paid by an
insurer as a result of a settlement or an adverse judgment or an adverse decision of a court"). Then,
the JUA introduced evidence concerning the total amount of money it paid on behalf of Scheffey and
the value of the additional coverage provided through Scheffey's policies. As a result of the various
claims made against Scheffey, the JUA paid indemnity claims totaling $3,176,000. In addition to
providing liability coverage, the policies issued by the JUA also covered defense costs from litigation,
post-judgment interest, premiums on appeal bonds, premiums on bonds to release attachments, and
investigative expenses incurred while defending a claim. These additional benefits have no express
monetary limit and are separate from liability coverage. In other words, under the policy terms, the
JUA must cover these expenses even if the policyholder has exceeded his liability coverage. As a
result of the claims filed against Scheffey, the JUA paid defense costs, fees, and expenses
totaling $311,756. 

 Further, several witnesses testified that the amount of the surcharge was appropriate. 
Deputy Commissioner David Durden and the Director of the Professional Liability Division of the
Department of Insurance, Kenneth McDaniel, testified that given the number and frequency of the
claims filed against Scheffey and all the benefits obtained through coverage, the surcharge was
reasonable and not excessive. In addition, Douglass Klein, a consulting actuary, also testified that
given Scheffey's claim history, the surcharge was appropriate and fair but also related that a non-surcharged premium would have been inadequate for the coverage provided. (10) 

 Based on this evidence, we conclude that the Commissioner's determinations were
supported by substantial evidence and not contrary to the relevant insurance code provisions.

 In an alternative argument, Scheffey contends that the surcharge was improper because
it was based on a flawed surcharge schedule. Specifically, Scheffey argues that the schedule was
based on the loss experiences of private insurers, not the JUA, and that the schedule was written when
the premium rates were significantly lower than the rates charged in the current market. Moreover,
he argues that there was no need to impose a surcharge on him because the JUA was experiencing
a surplus at the time it was imposed and, therefore, did not need to recover for any sustained losses. 
 We can find no fault with the fact that the JUA surcharge schedule was based on the
loss experience for private insurers. Subsection (4)(b) of the JUA Act required that the "rates, rating
plans, rating rules, [and] rating classifications" used by the JUA are subject to subchapter 5(B) of the
insurance code, which we previously concluded authorized the JUA to impose individualized rates
and surcharges. Former Tex. Ins. Code art. 21.49-3, § (4)(b)(1). Furthermore, subsection (4)(b) also
specified that when determining rates, the JUA should give "due consideration to the past and
prospective loss and expense experience for medical professional liability insurance within and
without this state of all of the member companies of the" JUA. Id. In other words, the JUA Act
specifically required that the JUA consider the loss experience of insurers in the private sector when
determining what rates and rate modifications to impose on its policyholders. Accordingly, the fact
that the surcharge schedule was based on the loss experience of private insurers is consistent with that
legislative directive. Moreover, although Scheffey contends that the surcharge schedule was improper
because it was based on premium rates that were significantly lower than the rates charged at the time
the surcharge was assessed, the testimony discussed previously demonstrated that the calculated
surcharge amount was appropriate under the circumstances.

 Finally, the fact that the JUA was experiencing a surplus during the relevant time
should not foreclose the JUA from charging a policyholder a higher rate when the policyholder has
had a requisite number of claims settled on his behalf. The surcharges were not imposed to recover
losses that the JUA had previously paid out on behalf of its policyholders. On the contrary,
surcharges were imposed to account for the risk of insuring policyholders with significant claim
histories. See Former Tex. Ins. Code art. 5.15-1, §§ 3(b), 4(b) (authorizing rates based on
individual risks). 

 Moreover, were we to accept Scheffey's argument, then policyholders with identical
claims filed against them in different policy periods would be treated differently solely based on
whether the JUA was experiencing a surplus or deficit at the time the claims were paid. In other
words, if the JUA was experiencing a deficit, then imposing a surcharge would be permissible, but
if the JUA was experiencing a surplus, no surcharge could be imposed. We cannot adopt a
construction that would treat identically situated policyholders so disparately. See Tex. Gov't Code
Ann. § 311.023(5) (explaining that courts may consider consequences of particular construction when
ascertaining meaning of statute); Railroad Comm'n v. Coppock, 215 S.W.3d 559, 565
(Tex. App.--Austin 2007, pet. denied) (refusing to adopt interpretation that would lead to arbitrary
results); see also Former Tex. Ins. Code art.  5.15-1, § 3(d) (prohibiting insurers from charging
"unfairly discriminatory" rates). 

 For these reasons, we overrule Scheffey's second issue on appeal. 


The Surcharge was Not an Unauthorized Modification to a Classification Rate

 In his third issue on appeal, Scheffey argues that the Commissioner erred when he
approved the JUA's (a) rate application because the rate requested was an "an unauthorized
modification of a classification rate." Specifically, Scheffey argues that before an insurer may impose
a rate on a policyholder that is different than the rate imposed on other policyholders belonging to that
class, an insurer is required to obtain the approval of the Board. See Former Tex. Ins. Code
art. 21.49-3, § 4(b)(2) (specifying that JUA is required to "submit, for the approval of the
[B]oard pursuant to Article 5.15 of the Insurance Code, an initial filing . . . of . . . rates, rating plans,
and rating rules applicable to medical liability insurance to be written by the" JUA); see also Act of
June 7, 1951, 52d Leg., R.S., ch. 491, art. 5.15, 1951 Tex. Gen. Laws 868, 929, amended by Act of
April 12, 1977, 65th Leg., R.S., ch. 108, § 1, 1977 Tex. Gen. Laws 225, 225, amended by Act of May
27, 1991, 72d Leg., R.S., ch. 242, § 2.17, 1991 Tex. Gen. Laws 939, 962 (requiring every insurer to
"file with the Board every manual of classifications, rules and rates, every rating plan and every
modification of any of the foregoing which it proposes to use") ("Former Tex. Ins. Code art. 5.15"),
repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 206, § 21.47(6), 2003 Tex. Gen. Laws 907, 961. 
However, Scheffey argues that a copy of the surcharge schedule was never filed for the approval of
the Board. In addition, Scheffey contends that the JUA failed to file information relevant to the
creation of the surcharge schedule as required by statute. See Former Tex. Ins. Code art. 5.15(a)
(stating that filings with Board "shall be accompanied by . . . the information upon which the insurer
supports the filing").

 For the reasons that follow, we disagree with Scheffey's assertions. 

 First, as discussed previously, the JUA had the authority to impose individualized rates
provided that the rate is "in accordance with . . . standards for measuring variations in hazards or
expense provisions, or both." Former Tex. Ins. Code art. 5.15-1, § 3(b). By utilizing the claim
history of a policyholder, the JUA schedule produces an individualized rate based on the risk of
insuring the policyholder. 

 Second, a copy of the surcharge schedule was filed with the Board in 1982. Although
the Board did not issue an order specifically approving the schedule, the relevant statutory scheme
provided that filings given to the Board were approved by operation of law 30 days after the filing
was made. In particular, former article 5.15 specified that by operation of law, "[a]ny filing" relevant
to, among other things, an insurer's rates, rating plans, or modifications to either, "shall be deemed
approved unless disapproved within thirty (30) days" and further required the Board to express its
disapproval of a filing in writing. Former Tex. Ins. Code art. 5.15(b) (emphasis added). The Board
never disapproved of the JUA's schedule. 

 However, even assuming that the surcharge schedule was not deemed approved in
1982, the Board has on several occasions approved the imposition of surcharges based on the
schedule and, thereby, arguably approved of the JUA's utilization of the surcharge schedule. Prior
to filing the (a) rate application concerning Scheffey, the JUA filed three (a) rate applications with
the Board. The applications specified that, as the result of claims that had been made against the
physicians, the JUA was seeking to impose surcharges calculated using the schedule. In three
separate orders, the Board approved the requested surcharges and found that the surcharges were "in
compliance with [former] Article 5.15-1 and Article 21.49-3" of the insurance code. 

 Moreover, in 1985 the Board promulgated rules allowing the Deputy Commissioner
to approve (a) rate applications. See Act of May 27, 1981, 67th Leg., R.S., ch. 460, § 1, 1981
Tex. Gen. Laws 2069, 2069, amended by Act of July 16, 1987, 70th Leg., 2d C.S., ch. 67, § 9, 1987
Tex. Gen. Laws 207, 212 (authorizing Board to adopt rules to create summary procedure for matters
deemed by Board to be routine matters) ("Former Tex. Ins. Code art. 1.33"), repealed by Act of
April 23, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538; 28 Tex. Admin. Code
§ 1.701 (2007) (specifying that Board has determined that certain matters are routine matters);
17 Tex. Reg. 4539 (1992) ("Former 28 Tex. Admin. Code § 1.702(4)") (listing approval of (a) rate
applications as routine matter), amended by 28 Tex. Reg. 3952 (2003); 17 Tex. Reg. 4539 (1992)
("Former 28 Tex. Admin. Code § 1.703(2)(B)") (specifying that Deputy Commissioner of
Casualty Insurance is responsible for approving (a) rate applications), amended by 28 Tex. Reg. 3952
(2003); 9 Tex. Reg. 5542 (1984) ("Former 28 Tex. Admin. Code § 5.1001") (detailing procedure for
approving (a) rate applications), repealed by 18 Tex. Reg. 4617 (1993). Under this summary
procedure, the Deputy Commissioner has approved seventeen (a) rate applications, including the one
relevant in this appeal, that were based on the JUA's surcharge schedule. 

 Regarding Scheffey's claim that the JUA should have filed information supporting the
schedule when it originally filed the schedule with the Board, former subarticle 5.15(a) did place a
burden on insurers to file information supporting their filing. See Former Tex. Ins. Code art. 5.15(a). 
However, the statute did not condition the Board's approval of the application on the insurers
fulfilling that obligation. Rather, as discussed previously, the statute created a default position of
approval by deeming a filing "approved" unless the Board specifically disapproved of the filing in
writing. Id. art. 5.15(b). Stated differently, filings without supporting documentation would also be
deemed approved unless specifically disapproved. Moreover, it is worth nothing that when the JUA
sought permission to impose a surcharge on Scheffey, it filed an additional copy of the surcharge
schedule as well as evidence of Scheffey's claim history as support for the proposed surcharge. 

 For the reasons previously given, we conclude that the surcharge schedule was
approved by the Board and that, consequently, Scheffey's (a) rate, which was based on the schedule,
was not an impermissible modification to Scheffey's classification rate. Accordingly, we overrule
Scheffey's third issue on appeal. (11) 


Scheffey's Consent was Not Required 

 In his fourth issue, Scheffey argues that even if the JUA had the authority to impose
a surcharge on its policyholders, the JUA was obligated to obtain his consent prior to imposing the
surcharge. In making this assertion, Scheffey refers to the portion of the JUA Act specifying that the
rates charged by the JUA are subject to the requirements of subchapter 5(B) of the insurance code. 
See Former Tex. Ins. Code art. 21.49-3, § 4(b)(1). Scheffey asserts that even if the JUA could impose
a surcharge under the relevant provisions of former article 5.15-1, see Former Tex. Ins. Code
art. 5.15-1, §§ 3(b), 4(b), 9, the surcharge must still comply with the requirements of former article
5.15 of subchapter (B), which applied "to the filing of rates and rating information" and were
incorporated by former article 5.15-1, see Former Tex. Ins. Code art. 5.15-1, § 4(a). One of the
provisions of former article 5.15 required an insurer to obtain the consent and signature of a
policyholder prior to imposing a rate or premium that is greater than the approved rate. See Former
Tex. Ins. Code art. 5.15(c). In light of these statutory cross-references, Scheffey asserts that the JUA
was obligated to obtain his consent prior to assessing the surcharge.

 We disagree with Scheffey. The statutory scheme in effect during the relevant time
seems to describe two different methods in which the rate or premium that a policyholder is charged
may be increased. The first method--(a) rate applications--was discussed previously. See Former
Tex. Ins. Code art. 5.15(a), (b); Former Tex. Ins. Code art. 5.15-1, §§ 3(b), 4(b), 9. This method
allows an insurer to charge policyholders a modified rate to account for "individual risks" provided
that the modification is based on standards, like a surcharge schedule, that measure "variations in
hazards or expense." Former Tex. Ins. Code art. 5.15-1 § 3(b). This method also requires that the
proposed rate be filed for approval. Former Tex. Ins. Code art. 5.15(a). 

 The second method is found in former subarticle 5.15(c), which provides as follows:


It is expressly provided, however, that notwithstanding any other provision of this
subchapter to the contrary, a rate or premium for such insurance greater than the
standard rate or premium that has been approved by the Board may be used on any
specific risk if:

 

(1) a written application is made to the Board naming the insurer and
stating the coverage and rate proposed;

 

(2) the person to be insured or person authorized to act in relation to
the risk to be insured consents to such rate;

 

(3) the reasons for requiring such greater rate or premium are stated
in or attached to the application;

 

(4) the person to be insured or person authorized to act for such
person signs the application; and

 

(5) the Board approves the application by order or by stamping.



Id. art. 5.15(c) (emphasis added). The use of the italicized phrase quoted above indicates that by
enacting subarticle 5.15(c), the legislature was authorizing an additional manner under which
insurers could impose a higher rate on their policyholders. Under this method, an insurer has the
authority to negotiate with a policyholder and charge a higher premium provided that the insured
consents to the increase. Further, unlike (a) rate applications, there does not appear to be any
requirement that the proposed modification be calculated using standards for measuring individual
risks or that information supporting the modification be filed with the application. Compare Former
Tex. Ins. Code art. 5.15-1, § 3(b), and Former Tex. Ins. Code art. 5.15(a), with id. art. 5.15(c). 

 The construction of former article 5.15 as describing two different methods is
consistent with the Board's interpretation of the statute. As discussed previously, the Board issued 
rules allowing for (a) rate applications and other applications to be approved by the Deputy
Commissioner. Former 28 Tex. Admin. Code § 1.702. These rules distinguished between (a) rate
applications and consent-to-rate applications. Id. § 1.702(4), (6). In particular, former rule 1.702
explained that (a) rate applications are those applications that are filed under the authority of former
article 5.15 and that seek modifications to the rates that physicians and casualty insurance
policyholders are charged. Id. § 1.702(4). Furthermore, the rule explains that consent-to-rate
applications are those applications that are filed under the authority of former article 5.15(c), which
requires the consent and signature of the policyholder, and that seek modifications to the rates that
casualty insurance policyholders, but not physicians, are charged. (12)
 This distinction is also found
in former rule 1.703, which assigns the authority to approve the two types of applications to the
Deputy Commissioner. Id. § 1.703(2)(B), (D). Moreover, the rule describing the manner in which
the Deputy Commissioner may approve an (a) rate filing does not condition approval on the insurer
having obtained the consent of the policyholder. Former 28 Tex. Admin. Code § 5.1001. 

 The Board also implemented this distinction when it processed the two types of
applications. A document utilized by the Board, entitled "Processing Medical (A) Rates and
Consent-To-Rates," distinguished between the two types of applications when describing the various
procedural steps that must be complied with as part of the approval process. Regarding (a) rate
applications, the document states that the applications must be reviewed and approved by an
insurance specialist. Unlike (a) rate applications, for consent-to-rate applications, the document
specifies that approval by a specialist is required only if the requested rate is more than double the
standard rate. Moreover, for consent-to-rate applications only, the document instructs the reviewer
to verify that the policyholder consented to and signed the application. 

 Finally, this construction seems correct when considered in the context of the JUA. 
The purpose of the JUA is to provide insurance coverage to individuals who are unable to obtain
coverage through the private market. Accordingly, the JUA will often provide coverage for
individuals whose claim histories are so extensive that private insurers would not insure them. 
Further, provided that an existing policyholder pays their required fees and meets certain
underwriting standards, the JUA is required to renew the policyholder's coverage. Former Tex. Ins.
Code art. 21.49-3, § 4(a)(2). 

 In light of the plain statutory language, the Board's reasonable construction of the
statute, and the object sought to be attained by enacting the JUA Act, we are persuaded that former
section 5.15 lists alternative methods by which insurers may impose individual rates and that a
policyholder's consent is not required for (a) rates. (13) Moreover, under Scheffey's interpretation, it
would essentially be impossible for the JUA to ever impose a surcharge. No matter how significant
a policyholder's claim history, the policyholder would have to consent to the surcharge. However,
the policyholder would have no incentive to ever consent to an increased rate because the JUA could
not condition the renewal of the policyholder's policy on the payment of the surcharge. In other
words, the JUA would be required to cover a policyholder with a shockingly high number of claims
filed against him provided that the policyholder meets certain underwriting standards, pays the
standard premium, pays the annual reserve fund charge, and pays an assessment imposed on all
policyholders to cover the JUA's annual deficit, if any. See Lowe v. Rivera, 60 S.W.3d 366, 369
(Tex. App.--Dallas 2001, no pet.) (stating that statutes should not be construed in manner that leads
to absurd results when more reasonable construction is available). 

 In a related assertion, Scheffey argues that the 19 prior approvals by the Board and
the Deputy Commissioner have no relevance to the surcharge imposed on him because the
physicians involved in those cases all "consented" to the surcharges by paying them without
contesting their legality. 

 We disagree with Scheffey's contention. The prior approvals are relevant to the
present case because in those previous decisions, the Board approved the utilization of the schedule
to produce surcharges for individual policyholders. Moreover, although the physicians' consent may
have been relevant to whether they chose to delay payment by appealing the surcharge, their consent
was not required because the proposed modifications were made through the (a) rate application
process, not the consent-to-rate process. Further, we see no reason to conclude that the Board or the
Deputy Commissioner would review the applications differently simply because the physician did
not consent to the increased rate. 

 For the reasons previously given, we overrule Scheffey's fourth issue on appeal. 


The Commissioner's Order is Supported by Substantial Evidence

 In his final issue on appeal, Scheffey contends that the Commissioner's order is not
supported by substantial evidence. See Tex. Gov't Code Ann. § 2001.174. In making his claim,
Scheffey specifically challenges several of the Commissioner's findings of fact and conclusions of
law. (14) Several of the challenges involve similar arguments. For this reason, we will group the
challenges together where appropriate. 


Specific Challenges

 Scheffey argues that findings 13, 14, and 15 and conclusion 4 are not supported by
substantial evidence. The findings relate that the JUA filed an (a) rate application regarding
Scheffey, that the Department of Insurance's staff recommended approving the application, and that
the Deputy Commissioner approved the application. Conclusion 4 states that the JUA was
authorized to impose a surcharge by the former provisions of the insurance code. 

 Scheffey also attacks findings 28, 29, 30, 31, 32, 33, 34, and 35. These findings relate
that it was the general practice of the JUA to inform a physician weeks before his renewal deadline
that a surcharge might be imposed on him and then file an (a) rate application with the Board seeking
permission to impose the surcharge. These findings also describe the details of the surcharge
schedule, the manner in which Scheffey's surcharge was calculated, the history of the creation of the
surcharge schedule, the purpose of the schedule, the fact that the schedule was based on actual claims
paid by the JUA, and the number of policyholders that the JUA has insured. 

 In challenging these findings, Scheffey does not contest the factual underpinnings of
these statements or contradict the accuracy of the findings. Instead, he asserts that the findings are
deficient because the JUA does not have the authority to impose a surcharge and because the
surcharge schedule was not approved by the Board. 

 However, as discussed in the prior sections, the former provisions of the insurance
code specifically authorized insurers, including the JUA, to impose individual rates and surcharges
on its policyholders. Further, we previously concluded that the JUA surcharge schedule was
approved by the Board. 

 Scheffey also challenges findings 16, 17, and 18. These findings state that all of the 
various renewal applications Scheffey signed over the years contained a clause notifying him that
his policy was subject to potential surcharges; that through the coverage it provides, the JUA was
obligated to defend a policyholder if a claim was made against him; and that the JUA was required
to obtain the consent of a policyholder prior to settling a claim. 

 Scheffey contends that the findings are inadequate because they do not account for
the facts that the JUA's authority to impose a surcharge is not mentioned in the JUA's plan of
operation or related policy forms. 

 The alleged omissions have no bearing on the sufficiency of the evidence supporting
the disputed findings. In other words, the Commissioner's failure to include in his findings that the
surcharge is not mentioned in various JUA documents is not relevant to whether there is a reasonable
basis supporting the Commissioner's statements concerning the clause in the JUA's applications and
the JUA's responsibility for defending its policyholders. Moreover, as discussed previously, the
failure to include the word "surcharge" in some of its documentation cannot prohibit the JUA from
exercising a power specifically bestowed on it by the legislature. 

 In addition to his prior complaints, Scheffey also challenges findings 6, 19, 20, 21,
23, 24, 25, 26, and 27. These findings identify the attorney hired by the JUA to defend Scheffey
during his various lawsuits and state that, prior to agreeing to settle his claims, Scheffey was
informed that the settlements would lead to a premium increase but that Scheffey did not inquire
about how the new premium would be calculated. Further, the findings specify that Scheffey
ultimately agreed to spread his settlements over more than one policy period but never inquired about
whether spreading the settlements would qualify as more than one claim. The findings also list the
liability coverage Scheffey had when the relevant claims were made against him, relate the details
of the various settlements and litigation expenses that the JUA paid on behalf of Scheffey, and
describe how the settlement amounts were spread over several policy periods. Additionally, the
findings relate that because the settlement of the Dunstan and Oseguera lawsuits was spread over
more than one policy period, the JUA, in effect, paid six claims on behalf of Scheffey. Finally, the
findings state that after the claims were settled, the JUA sent Scheffey a renewal letter informing him
that he would be required to pay a surcharge and that a copy of the surcharge schedule was
attached to the letter.

 Scheffey asserts that these findings are improper because they do not address the fact
that prior to receiving the renewal letter, he had never been provided a copy of the surcharge
schedule. Scheffey also contends that the findings are inadequate because they do not account for
the fact that prior to his claims being settled, he was not informed that spreading the payment of his
settlements over more than one policy period would be treated as additional claims having been
filed against him. 

 The disputed findings are adequately supported by the record. Although the findings
do not specifically refer to Scheffey's testimony that he was unaware of the existence of the schedule
until it was mailed to him, nothing in the disputed findings contravenes that testimony. Further,
Scheffey did testify that prior to the JUA settling any of the claims made against him, he was
informed that the settlement of three or more claims within a four-year period would subject him to
an additional charge. In addition, Scheffey testified that he was aware that the various applications
and renewals that he had signed over the years contained a clause warning policyholders that they
may be subject to surcharges, and Scheffey was given a copy of the schedule 90 days before his
renewal date. Moreover, Scheffey refers to no legal basis that would have conditioned the JUA's
ability to impose a surcharge on the JUA providing its policyholders with more than 90 days' notice
of the potential surcharge.

 The JUA's determination regarding the number of claims paid is also supported by
the evidence in the record. There is no dispute that Hardman filed one claim against Scheffey and
that the JUA paid to settle that claim. As for the Dunstan and Oseguera allegations, there is
substantial evidence to support the Commissioner's finding that the JUA settled three claims made
by Dunstan and two claims made by Oseguera. Wayne Witmer, an employee for the member
company that issued a policy to Scheffey on behalf of the JUA, testified that although Dunstan and
Oseguera each filed only one lawsuit, they both alleged multiple acts of medical malpractice. 
Witmer also testified that the only reason it was possible to spread the Dunstan and Oseguera
settlements over several policy periods was because Dunstan and Oseguera both alleged numerous
acts of malpractice with occurrence dates in different policy periods. Conversely, he testified that
if Dunstan and Oseguera had alleged single acts of malpractice, the JUA would not have been able
to spread the settlements over multiple policy periods. In other words, Scheffey would not have
received the benefit of spreading the payment of the lawsuit over several periods and would have
exhausted his coverage for single occurrences. Further, three individual medical-malpractice
payment reports were filled out regarding Scheffey's treatment of Dustan, and two were filled out
regarding Scheffey's treatment of Oseguera. These reports described multiple acts of alleged
malpractice with unique occurrence dates. In addition, Scheffey testified that he performed or helped
perform three distinct surgeries on Dunstan and that he performed multiple surgeries on Oseguera. 
 Scheffey also contests the factual basis for findings 36, 37, 38, and 39, which state
that, since 1983, the JUA has filed 19 (a) rate applications seeking approval to impose surcharges
on various physicians and that the amount of the requested surcharges was calculated using the
JUA's schedule. The findings also relate that all 19 applications were approved by either the Board
or the Deputy Commissioner. In addition, the findings specify that the JUA applies the schedule to
all of its physicians. 

 Scheffey complains that the physicians involved in these (a) rate applications
consented to the increased rates, and therefore, the applications cannot be used as prior precedent
to justify the surcharge imposed on Scheffey. However, as previously described, there is no
requirement that a physician consent to an (a) rate application before a modified rate may properly
be imposed on a policyholder. Therefore, the fact that the Commissioner did not specify that the
other physicians consented to the surcharge does not render the finding deficient. 

 In addition to his previous challenges, Scheffey also attacks findings 44 and 45 and
conclusion 10. The findings list the number of orthopedic surgeons in Texas and in Harris County,
the number of orthopedic surgeons insured by the JUA, and the number of private insurers offering
medical malpractice coverage in Texas. Additionally, the findings state that, at the time, there was
a reasonable degree of competition for medical malpractice coverage, and the findings and
conclusion state that the surcharge imposed on Scheffey is reasonable, not unfairly discriminatory,
and not excessive. 

 Scheffey argues that the findings and the conclusion are not supported by the evidence
because the surcharge was unreasonable, discriminatory, and excessive. We discussed these
assertions previously, and for all the reasons listed in that section, we conclude that there was
substantial evidence supporting the findings and the conclusion. 

 In addition, Scheffey challenges findings 40, 41, 42, and 43 and conclusion 3. In
attacking these determinations, Scheffey relies on a generalized assertion that the findings are not
supported by the relevant evidence, law, and rules. For the reasons that follow, we disagree with
Scheffey.

 Finding 40 states that, in January 1993, the JUA filed an (a) rate application seeking
permission to impose a surcharge on Scheffey. The finding also states that Scheffey was the first
physician to contest one of the JUA's surcharges. 

 A copy of the JUA's filing is attached to the administrative record as an exhibit. The
filing is dated January 13, 1993, and by its terms, the filing sought approval to impose a surcharge
on Scheffey. Further, McDaniel testified that there was no evidence that any of the previous (a) rate
applications had been contested. Moreover, the general manager of the JUA testified that Scheffey
was the first physician to contest an (a) rate application. 

 Finding 41 provides that the JUA's and Scheffey's attorneys were given an
opportunity to comment on the application and that the comments were reviewed by Kenneth
McDaniel and Nancy McGrath, another Department of Insurance employee. Finding 42 specifies
that McDaniel and McGrath recommended approving the surcharge. 

 McDaniel testified that both he and McGrath reviewed the (a) rate application and
recommended that the application be approved because the surcharge was calculated in the same
manner that had previously been used by the JUA and because the surcharge was based on claims
paid by the JUA on behalf of Scheffey. McDaniel also prepared a memo for the Deputy
Commissioner recommending that the application be approved. In the memo, McDaniel wrote that
the attorneys for Dr. Scheffey and the JUA both submitted comments regarding the (a) rate
application and that both he and McGrath reviewed the filing and the materials submitted
by the parties. 

 Finding 43 relates that the Deputy Commissioner concluded that he had the authority
to approve the (a) rate application even though Scheffey was contesting the surcharge. The finding
further specifies that the Deputy Commissioner concluded that the surcharge was reasonable and
consistent with the relevant requirements of the insurance code and then approved the application. 

 As discussed previously, former Board rules authorized the Deputy Commissioner
to approve (a) rate applications through a summary procedure, and the rules made no reference to
a requirement that a policyholder consent to an (a) rate application before the modified rate may be
imposed. 28 Tex. Admin. Code § 1.701; Former 28 Tex. Admin. Code § 1.702. Further, the Deputy
Commissioner testified that the approval of (a) rate applications is routine and repetitive and that his
approval authority was not affected by the fact that Scheffey contested the amount of the surcharge. 
In particular he noted that although the approval of the surcharge might be controversial to Scheffey,
that fact did not deprive him of authority over the case because under section 1.701, the controversial
nature of an application is relevant only if the application is controversial to individuals that are not
part of the application process. See 28 Tex. Admin. Code § 1.701 (specifying that certain activities
are appropriate for resolution through summary procedures because, among other reasons, activities
are "of limited interest to persons other than those immediately involved in or affected by the
proposed agency decision."). In addition, as discussed previously, the surcharge complied with the
relevant statutory requirements in effect during the relevant time, and the Deputy Commissioner's
testimony in the administrative hearing reflected that fact. Moreover, the stamp affixed to the (a)
rate application demonstrates that the application was approved by the Deputy Commissioner in
January 1993. 

 Conclusion 3 specifies that former insurance code provisions authorized the JUA to
file (a) rate applications. Further, the conclusion states that the Board "lawfully delegated review
of such (a) rate applications to the Deputy Commissioner." 

 We have already discussed how the insurance code provisions in effect during the
relevant time for this appeal allowed the JUA to submit applications to charge policyholders
modified rates. Regarding the Board's delegation, former article 1.33 authorized the Board to
designate certain activities as routine matters and to adopt rules to handle those matters by summary
procedures. Former Tex. Ins. Code art. 1.33(a). Under this authority, the Board promulgated rules
allowing for the summary disposition of (a) rate applications. See 28 Tex. Admin. Code § 1.701;
Former 28 Tex. Admin. Code §§ 1.702-.705; Former 28 Tex. Admin. Code § 5.1001. Those rules
were not challenged and were in effect during the time relevant to this appeal. (15) 

 Scheffey also challenges conclusions 5, 6, 7, 8, and 9 by asserting that the conclusions
"are not supported by the law and are made contrary to such." Although he does not set out the
alleged inadequacies of these conclusions, we will demonstrate why the various conclusions are
supported by substantial evidence and the relevant laws and rules in effect during the
relevant time period. 

 Conclusion 5 reads, in relevant part, as follows: "Application of the JUA surcharge
schedule is based exclusively upon actual claims paid by the JUA as the result of settlement, adverse
judgment or adverse decision of a court relating to the insured, as required by" the former provisions
of the insurance code. 

 The JUA surcharge schedule only allows for the imposition of a surcharge on a
policyholder who has "had three (3) or more indemnity claims paid . . . as a result of a settlement or
an adverse judgment, or an adverse decision of a court." Further, under the schedule, the amount
of the surcharge imposed is also based on the amount of the various claims settled on behalf of a
policyholder. In other words, the surcharge schedule only considers claims actually paid for the
purpose of determining the amount of a surcharge. This limitation comports with the requirements
of former section 9 of article 5.15-1, which specifies that a surcharge can be based "only on claims
actually paid by an insurer as a result of a settlement or an adverse judgment or an adverse decision
of a court." Former Tex. Ins. Code art. 5.15-1, § 9. For this reason, we conclude that conclusion 5
is consistent with the former provisions of the insurance code. 

 Conclusion 6 reads, in relevant part, that the purpose of the JUA surcharges is "to
obtain an adequate premium for future exposure to loss from insuring a risk with unusual or unique
hazards or expenses" and that this purpose comports with the former provisions of the
insurance code.

 By basing the calculation of a surcharge on a policyholder's claim history, the
schedule produces rates that reflect an increase in the risk of insuring a particular policyholder. This
is consistent with the statutory requirement that individualized rates be based on plans measuring
variations in hazards or expenses. See Former Tex. Ins. Code art. 5.15-1, §§ 3(b), 4(b), 9. Further,
several witnesses testified concerning the purpose of the surcharges. In particular, the general
manager of the JUA, a consulting actuary, and the Deputy Commissioner testified that surcharges
represent the additional charges that must be imposed in order to adequately cover the increased risk
of future losses that results from insuring individuals with extensive claim histories. In other words,
the surcharges are designed to ensure that an insurance company receives an adequate premium for
insuring physicians with an unusually high risk of claims being filed against them. Further, as proof
that surcharges are imposed only on unique risks, the general manager noted that the JUA has
provided coverage for over 27,000 policyholders but only imposed a surcharge 19 times. 

 Conclusion 7 reads, in relevant part, as follows: "The JUA has properly obtained the
approval of the State Board of Insurance, or its lawful delegate, each time it has imposed the
surcharge on individual physicians." The conclusion further relates that a copy of the schedule was
given to the Board when the schedule was created, that surcharge calculations based on the schedule
were presented to the Board for approval on three occasions, and that the surcharges approved by
the Deputy Commissioner were also based on the schedule. 

 A copy of the surcharge schedule was given to the Board after it was finalized by the
JUA in the 1980s. After giving the Board a copy of the schedule, the JUA filed three (a) rate
applications with the Board seeking approval to charge a policyholder a modified rate. These
applications were approved by the Board. See Former Tex. Ins. Code art. 5.15(a); Former Tex. Ins.
Code art. 21.49-3, § 4(b)(2). In addition, after the power to approve the (a) rate applications was
delegated to the Deputy Commissioner, the JUA filed 16 (a) rate applications, and the Deputy
Commissioner approved these applications. See Former 28 Tex. Admin. Code § 1.703(2)(B);
Former 28 Tex. Admin. Code § 5.1001. 

 Furthermore, the proposed surcharges in the (a) rate applications filed with the Board
and the Deputy Commissioner were all based on the JUA's schedule. In fact, all 19 applications
contain calculations derived from the schedule. Moreover, the Supervisor of the Medical
Professional Liability Division of the Texas Department of Insurance, Charles Sobeck, testified that
he utilized the surcharge schedule when reviewing the JUA's (a) rate applications. 

 Conclusion 8 specifies that the JUA's (a) rate application concerning Scheffey
complied with the filing procedure detailed in the administrative code. 

 The relevant filing procedure was found in former section 5.1001(b) of title 28 of the
administrative code. That provision provided that:


All (a) rate applications must indicate the rate or rates the insurer proposes to charge
and a complete description of the (a) rated exposures and pertinent date for such rate
or rates. In the event the information accompanying the application is not considered
sufficient to justify the proposed rates, the submission will be disapproved or the
submitting insurer will be permitted to supply additional data.



Former 28 Tex. Admin. Code § 5.1001(b). 

 The application complied with the above requirements because it (1) detailed
Scheffey's insurance coverage, his standard premium, and the amount of the requested surcharge;
(2) contained a summary of the six claims that the JUA paid on behalf of Scheffey, including the
amount paid for each claim and the date each claim was paid; and (3) provided a chart showing how
the number and amount of the claims paid were used to calculate requested surcharge. Furthermore,
a copy of the JUA surcharge schedule was attached to the application. 

 Conclusion 9 states that the JUA submitted the application to the Deputy
Commissioner for review as a summary procedure in accordance with the relevant requirements. 

 As previously discussed, the Deputy Commissioner was authorized to review (a) rate
applications through a surcharge procedure. See Former 28 Tex. Admin. Code § 1.703(2)(B). 
Scheffey filed the application with the Deputy Commissioner, and the Department of Insurance's
staff reviewed the application. As discussed previously, McDaniel prepared a memo recommending
that the application be approved and stating that the "(a) rate application was correctly completed
by the . . .  JUA." McDaniel also testified that he reviewed the (a) rate application to ensure that it
was completed correctly and verified that the calculations used by the JUA resulted in the surcharge
requested. After receiving the recommendation from McDaniel, the Deputy Commissioner approved
the application. 

 Finally, Scheffey argues that the final conclusion by the Commissioner,
conclusion 11, is "deficient." The pertinent part of conclusion 11 provided that the surcharge
was proper.

 In light of our resolution of Scheffey's prior issues on appeal and our conclusion that
the findings and conclusions forming the basis for conclusion 11 are supported by substantial
evidence, we also conclude that the Commissioner's final conclusion is supported by
substantial evidence.


Interest of Justice

 In a separate argument, Scheffey asks this Court to vacate the Commissioner's order
and also argues that the district court erred by failing to vacate the Commissioner's order. 
Essentially, Scheffey contends that the insurance code authorizes courts to vacate an order when the
interests of justice require it and insists that the circumstances in this case warrant the utilization of
that power. (16) The relevant provision of the insurance code provides as follows: 


(a) The filing of a petition for judicial review of an action under this subchapter does
not vacate the action.


(b) After notice and hearing, the court may vacate the action if the court finds it
would serve the interest of justice to do so.



Tex. Ins. Code Ann. § 36.204 (West 2007) (emphasis added). 

 Assuming for the sake of argument that section 36.204 does give courts the additional
power to vacate orders by the Commissioner, (17) we hold that the district court did not err. The use
of the word "may" in the statute imbued the district court with the discretion to vacate the
Commissioner's order when the court concluded the interest of justice required that type of extreme
remedy. See Tex. Gov't Code Ann. § 311.016 (explaining that word "may" gives discretionary
power). A district court abuses its discretion when it acts unreasonably, arbitrarily, or "without
reference to any guiding rules or principles." Cire v. Cummings, 134 S.W.3d 835, 839 (Tex. 2004). 
In light of our conclusions that the JUA had the authority to impose a surcharge, that the surcharge
imposed complied with the relevant statutory requirements, and that the Commissioner's order was
supported by substantial evidence, we cannot conclude that the district court abused its discretion
by failing to vacate the order.

 Scheffey also argues that this Court should vacate the Commissioner's order. 
However, the ability to vacate an order by the Commissioner seems to be limited to the district court. 
The phrase "the court" found in section 36.204 refers back to sections 36.202 and 36.203, which
specify that a party may seek judicial review of an action by the Commissioner in district court. See
Tex. Ins. Code Ann. §§ 36.202-.203. Furthermore, the provision of the insurance code governing
appellate review of an order by the Commissioner is found after section 36.204. See id. § 36.205. 
Regardless, the same justifications regarding our resolution of Scheffey's other issues on appeal
would also compel us to conclude that the Commissioner's order should not be vacated. 

 

CONCLUSION

 Having overruled all of Scheffey's issues on appeal, we affirm the judgment of the
district court.

 

 David Puryear, Justice

Before Chief Justice Law, Justices Puryear and Pemberton

Affirmed

Filed: February 15, 2008
1. At the time this case was tried, the notice of appeal cited Edna R. Butts was the Interim
Commissioner of Insurance, and Glorial Leal was the Temporary Acting Commissioner of Insurance. 
However, Mike Geeslin now the current Commissioner of Insurance.
2. On appeal, the Commissioner adopts by reference the entirety of the JUA's briefing. See
Tex. R. App. P. 9.7 (proving that "Any party may . . . adopt by reference all or any part of a brief . . .
by another party in the same case"). 
3. In his testimony, Scheffey admitted that he was aware that all of the applications contained
the previously quoted language. 
4. According to the JUA, when it determined that it was necessary to impose a surcharge on
a policyholder, it typically sent a policyholder a renewal letter specifying the amount of the surcharge
and then filed an (a) rate application seeking approval from the Deputy Commissioner. 
5. The Department of Insurance used to be called the Board of Insurance. See
Old Am. County Mut. Fire Ins. Co. v. Sanchez, 149 S.W.3d 111, 118 (Tex. 2004). Because many of
the statutes involved in this case refer to the Board, we will refer to the Board rather than the
Department.
6. Because the JUA Act incorporated various provisions of the insurance code authorizing
surcharges, there is no need to determine whether the authority to impose a surcharge can be implied
from the specific powers listed in the JUA Act. 
7. Scheffey argues that although former subsection 4(b)(1) of the JUA Act referenced the
subchapter of the insurance code allowing for individual rates and surcharges, section 4(b)(1) also
stated "that if any article of [the referenced] subchapter is in conflict with any provision of the Act,
this Act shall prevail." Former Tex. Ins. Code art. 21.49-3, § 4(b)(1); see also Former Tex. Ins. Code
art. 5.15-1, § 3(b) (allowing for individual rates), § 9 (allowing for imposition of surcharges). In
light of this language and the fact that the JUA Act does not contain the term "surcharge" in any of
its provisions, Scheffey argues that the authority to impose a surcharge found in former article 5.15-1
conflicts with the terms of the JUA Act and must, therefore, yield to the directives of the JUA Act. 


 We disagree. The JUA Act did not contain any language specifying that the JUA is
prohibited from charging individual policyholders higher premiums to account for the risk of
insuring individuals with significant claim histories. Moreover, the incorporating language of
subsection 4(b)(1) was not limited to certain provisions of subchapter 5(B). For these reasons, we
do not believe that the surcharge provisions of former article 5.15-1 conflict with any portion of the
JUA Act. 
8. The relevant subsection reads, in its entirety, as follows:


Rates shall be reasonable and shall not be excessive or inadequate, as defined in this
subsection, nor shall they be unfairly discriminatory. No rate shall be held to be
excessive unless the rate is unreasonably high for the insurance coverage provided
and a reasonable degree of competition does not exist in the area with respect to the
classification to which the rate is applicable. No rate shall be held to be inadequate
unless the rate is unreasonably low for the insurance coverage provided and is
insufficient to sustain projected losses and expenses; or unless the rate is
unreasonably low for the insurance coverage provided and the use of the rate has or,
if continued, will have the effect of destroying competition or creating a monopoly.


Former Tex. Ins. Code art. 5.15-1, § 3(d).

9. In his reply brief, Scheffey argues that the fact that he had to obtain coverage through the
JUA proves that there was not a reasonable degree of competition. However, this assertion confuses
the existence of a market for insuring a particular type of physician with whether a particular
physician can obtain coverage in that market in light of his or her individual claim history. The
evidence given to the Commissioner demonstrated that there were several insurance companies
providing coverage in Scheffey's geographical area and that those providers were insuring
orthopedic surgeons. 
10. It is worth noting that Scheffey points to no testimony showing that the surcharge amount
was unreasonable. 
11. Alternatively, Scheffey contends that even if a surcharge may be imposed, the application
form specifies that the JUA is required to obtain the approval of the Board before imposing the
surcharge. Because the JUA did not obtain approval by the time the renewal payment was due,
Scheffey insists that he was not required to pay the surcharge as a condition to his policy being
renewed. 


 We disagree with this assertion. Scheffey's argument might be relevant to the timing of the
payment of the surcharge but does not seem relevant to a determination of whether he is in fact
obligated to pay the surcharge. In other words, it might be the case that a policyholder is not
obligated to pay a surcharge until that surcharge has actually been approved, but nothing in the
statutory scheme indicates that the failure to have the rate approved by the renewal date forecloses
the possibility of imposing a surcharge on a policyholder. Moreover, the general manager of the
JUA testified that it is the general practice of the JUA to inform policyholders that they may be
subject to a surcharge prior to seeking approval for the surcharge in an effort to conserve the Board's
time and resources. Essentially, if, after learning of the possible surcharge, a policyholder elects to
not renew his policy with the JUA, there would be no need to have the surcharge approved. 


 Even assuming that it would be improper to require a policyholder to pay a surcharge as a
condition for renewal prior to approval, that did not occur in this case. Scheffey appealed the
imposition of the surcharge, and the Commissioner suspended the surcharge until a final resolution
was reached. It was only after the Deputy Commissioner and Commissioner approved the (a) rate
application that Scheffey became obligated to pay the surcharge. 
12. The relevant language of the rule states that the following activities are designated for
summary disposition: 


(4) Subchapter B, (a) rates. Average (a) rate applications filed for the types of
insurance specified in the Insurance Code, Articles 5.13 and 5.15-1, pursuant to the
Insurance Code, Article 5.15;


. . .


(6) Subchapter B, consent to rate. Applications to charge a rate or premium greater
than the standard rate or premium greater than the standard rate or premium approved
by the Board for the types of insurance specified in the Insurance Code, Article 5.13,
pursuant to the Insurance Code, Article 5.15[(c)].



Former 28 Tex. Admin. Code § 1.702 (4), (6) (emphases added); see also Tex. Ins. Code Ann. art.
5.13 (West Supp. 2007) (pertaining to writing of casualty insurance and specifically stating that
provision did not apply to writing of professional liability insurance).

13. This supposition is supported by the testimony of the general manager of the JUA, Joe
Chilton, who stated that the surcharge schedule was necessary because unlike private insurers, the
JUA, as the insurer of last resort, is prohibited from canceling coverage for high risk policyholders. 
In other words, the JUA was required to provide coverage regardless of the number of claims filed
against a policyholder. Further, Chilton testified that the schedule was created because "there had
to be some consideration given to rating those with multiple claims." 
14. As an additional argument, Scheffey also asserts that the Commissioner erred by failing
to adopt his proposed findings of fact and conclusions of law because those proposals were
supported by substantial evidence. However, in conducting a substantial evidence review, we are
limited to determining whether the Commissioner's order, findings, and conclusions are supported
by the evidence. For this reason, we need not address Scheffey's contention.
15. In addition to his general assertion that findings 40, 41, 42, and 43 and conclusion 3 are
not supported by substantial evidence, Scheffey also argues, without citation to authority or the
record, that the approval of the (a) rate application was not routine or noncontroversial and that a full
hearing should have been conducted. He also asserts that conclusion 3 is not supported by the law. 
With these assertions, Scheffey appears to be contesting the propriety of the Board's decision to
promulgate rules for the summary disposition of (a) rate applications. However, in addition to
failing to adequately brief these contentions, see Tex. R. App. P. 38.1(h), Scheffey did not properly
challenge the validity of the promulgated rules, see Tex. Gov't Code Ann. § 2001.038 (West 2000)
(authorizing party to seek declaration concerning validity or applicability of rule promulgated by
agency); see also City of Alvin v. Public Util. Comm'n, 143 S.W.3d 872, 879 (Tex. App.--Austin
2004, no pet.) (validity challenge is test of agency's rule on procedural and constitutional grounds,
including whether agency had authority to promulgate rule). 
16. In making this assertion, Scheffey refers to former article 1.04 of the insurance code. See
Act of May 27, 1991, 72d Leg., R.S., ch. 242, § 1.02, 1999 Tex. Gen. Laws 939, 939. That provision
was repealed in 1999, see Act of April 23, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws
486, 538, and reenacted with the contents of the former provision recodified into multiple provisions
of the insurance code, see Tex. Ins. Code Ann. §§ 36.201-.205 (West 2007). Because any
differences between the former provision and the current provisions do not affect the parties
arguments or the outcome of this appeal, we will refer to the current version of the insurance code. 

17. We note that the JUA strongly disputes that subsection (b) grants reviewing courts any
power that is distinct from their power to determine whether the Commissioner's orders are
supported by substantial evidence.